FILED
SEP 14 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 1:26 CR 00406 |
| | ) | Title 18, United States Code, Sections 1343 and 1957 |
| JEFFREY SKINNER, | ) | |
| Defendant. | ) | JUDGE ADAMS |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

Defendant and Relevant Entities and Financial Institutions

1. Defendant JEFFREY SKINNER resided in Bucyrus, Ohio, in the Northern District of Ohio, Eastern Division. Defendant is a Certified Public Accountant.

2. Church 1 was a non-denominational Christian church in Bucyrus, Ohio, with an incorporated entity name and popular name used with the public. Defendant served as the accountant and treasurer for Church 1. He was also a board member of Church 1 and had signature authority over Church 1's financial accounts.

3. Dealer Entity was a used car business in Bucyrus, Ohio that Defendant owned and controlled. Defendant's marketing of the business emphasized his and the business's "integrity."

4. The Bana Foundation was a non-profit entity that Defendant created and controlled with a headquarters address in Bucyrus, Ohio. Defendant established the Bana Foundation in and around April 2020.

5. Timothy Plan LTD was a commercial entity that Defendant created, owned, and controlled with a business address in Bucyrus, Ohio.

6. Aviator, Inc. was a commercial entity that Defendant created, owned, and controlled with a business address in Bucyrus, Ohio.

7. Lender 1 and Lender 2 were third-party participating Paycheck Protection Program lenders.

The Paycheck Protection Program

8. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses, and assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans, which had government-backed guarantees.

9. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to Americans suffering the economic effects caused by the COVID-19 pandemic. One source of relief under the CARES Act was authorization for the SBA to issue loans to small businesses and non-profit entities experiencing revenue loss due to the pandemic.

10. Two forms of assistance under the CARES Act were the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program, both of which provided loan assistance for certain businesses negatively affected by the COVID-19 pandemic.

11. The PPP was a COVID-19 pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

12. To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents.

13. PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located in Virginia or Oregon. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

14. The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase securities, consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

The Economic Injury Disaster Loan Program

15. Certain provisions of the CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed the SBA to offer EIDL funding to businesses and non-profit organizations that existed in an operational condition on February 1, 2020, and were negatively affected by the COVID-19 pandemic.

16. To apply for EIDL funding, applicants submitted personal and business information via the SBA online portal. The EIDL application process involved filling out an electronic form with information relating to the applicant's business in the 12 months prior to the COVID-19 pandemic.

17. The information to be provided to the SBA by the applicant included the ownership of the affected business; the size of the business; the type of business; the number of employees; the gross business revenues realized; and the cost of goods sold. This information, submitted by the applicant, was then used by SBA systems to calculate the amount of money the applicant was eligible to receive.

18. When submitting an application, applicants for EIDL funding had to affirmatively certify by checking a box that the information in the application was true and correct under the penalty of perjury and applicable criminal statutes. Applicants generally did not have to submit documentation supporting the representations in the applications.

19. In conjunction with the submission of an EIDL application, at certain times during the EIDL program, an applicant could also request and then receive an EIDL Cash Advance Grant (an "Advance"), generally up to $1,000 per employee, up to a total of $10,000. The Advance was not required to be repaid to the SBA if the loan application was ultimately denied by the SBA, or if the applicant declined the EIDL that might be offered by the SBA at a later date.

20. A non-agricultural, for-profit applicant was generally eligible to receive EIDL funding in an amount corresponding to its gross margin over six months (generally consisting of the reported revenue minus the reported cost of goods sold), less the amount of any Advance and

certain other government-backed compensation, with interest accruing at a rate of 3.75%. Certain businesses and non-profit entities (including Church 1) received a lower interest rate.

21. Funds paid by the SBA under the EIDL program were processed and issued by SBA from the state of Colorado and sent to the applicant borrower's financial institution.

22. Pursuant to the provisions governing the EIDL program, loan proceeds were required to be used by the affected business receiving EIDL funding only for certain permissible expenses. Proceeds from the loans could be used as working capital to pay normal operating expenses such as continuation of health care benefits, rent, utilities, and fixed debt payments.

COUNTS 1-5
(Wire Fraud, 18 U.S.C. § 1343)

The United States Attorney charges:

23. The factual allegations of paragraphs 1 through 22 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

The Scheme to Defraud

24. From in or around March 2020 through in or around April 2024, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JEFFREY SKINNER devised and intended to devise a scheme and artifice to defraud the Small Business Administration and Lenders 1 and 2, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

Purposes of the Scheme

25. The purpose of the scheme was for Defendant to unjustly enrich himself by (a) obtaining PPP and EIDL loans from PPP lenders and the SBA through false statements; (b) diverting proceeds for Defendant's use; and (c) concealing the scheme.

Manner and Means of the Scheme

26. It was part of the scheme that:

a. Defendant made false representations on PPP and EIDL applications, including about the applicant business or non-profit and about his intention to use the loan proceeds consistent with PPP and EIDL program rules.

b. Defendant created and submitted falsified documents to support the applications.

c. In connection with his fraudulent loan applications, Defendant also obtained EIDL Advances on behalf of Church 1 and Dealer Entity.

d. Once Defendant received ill-gotten proceeds, he transferred funds to various accounts under his control and used funds to make personal expenditures, including paying off personal credit card debts and transferring and depositing loan proceeds into brokerage and cryptocurrency accounts under his control to then purchase stocks and cryptocurrency.

e. Defendant concealed the misuse of PPP and EIDL funds for personal purposes through the Bana Foundation. Defendant established the Foundation in April 2020, opened accounts in the Foundation's name, and then transferred funds, including loan proceeds, to those accounts and then used the Bana Foundation account for additional stock and cryptocurrency purchases and other personal expenditures, including student loan payments.

f. Defendant made false representations to obtain PPP forgiveness, claiming to have spent PPP loan proceeds in a manner that qualified for a PPP loan to be forgiven, in order to cause the SBA pay off the amount due on the loan, including accrued interest, on the borrower's behalf, effectively converting a PPP loan into a government grant obtained by fraud.

g. Defendant further sought to conceal the scheme and avoid his obligation to repay EIDL funds by using his control over Church 1's bank accounts to issue checks to the SBA to make small payments on Church 1's EIDL loan, without Church 1's knowledge.

Acts in Furtherance of the Scheme

27. In furtherance of the scheme and to accomplish its purpose, Defendant committed and caused to be committed, in the Northern District of Ohio, Eastern Division, and elsewhere, the following acts, among others:

28. On or about the dates listed below, Defendant applied for the following PPP and EIDL loans, either using materially false statements about the entities' operational status, revenues, and employees, or falsely representing that that he had authority to apply for loans on behalf of Church 1 and would use the proceeds for the operations of Church 1, causing the SBA and Lender 1 and 2 collectively to issue $896,827 in PPP and EIDL funds:

| **Name** | **Type** | **Lender** | **Application Date** | **Funded Date** | **Amount** |
|---|---|---|---|---|---|
| Church 1 | EIDL | SBA | March 31, 2020 | May 22, 2020 | $150,000 |
| Timothy Plan LTD | PPP | Lender 1 | May 3, 2020 | May 5, 2020 | $190,900 |
| Aviator, Inc. | PPP | Lender 2 | Jan. 30, 2021 | March 4, 2021 | $55,927 |
| Dealer Entity | EIDL | SBA | Feb. 8, 2021 | Jan. 15, 2022 | $500,000 |
| Church 1 | EIDL | SBA | Sept. 20, 2021 | *Not Funded* | $350,000 |
| **Total Amount Sought** | | | | | **$1,246,827** |
| **Total Amount Funded** | | | | | **$896,827** |

a. In support of these fraudulent applications, Defendant submitted falsified documents, including (a) a falsified 2019 Form 941 (Employer's Quarterly Federal Tax Return) for Timothy Plan LTD, (b) a falsified 2019 Form 1120 (U.S. Corporation Income Tax Return) for Aviator, Inc., and (c) a forged 2020 Church 1 Board Resolution.

b. Defendant caused the SBA to approve and fund or guarantee all of the loans sought in these applications except for the application to increase the Church 1 EIDL loan by an additional $350,000 on or about September 20, 2021, which the SBA rejected and flagged for fraud.

Execution of the Scheme

29. On or about each of the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JEFFREY SKINNER, for the purpose of executing the scheme described above, and attempting to do so, transmitted, and caused to be transmitted, by means of wire communication in interstate commerce the following writings, signs, signals, pictures, and sounds, each transmission routed from Ohio across state lines, and each constituting a separate count of this Information:

| Count | Date | Transmission Description |
|---|---|---|
| 1 | March 31, 2020 | Electronic submission of EIDL application in the name of Church 1 |
| 2 | May 3, 2020 | Electronic submission of PPP loan application in the name of Timothy Plan LTD |
| 3 | Jan. 30, 2021 | Electronic submission of PPP loan application in the name of Aviator, Inc. |
| 4 | Feb. 8, 2021 | Electronic submission of EIDL application in the name of Dealer Entity |
| 5 | Sept. 20, 2021 | Electronic submission of EIDL application in the name of Church 1 |

All in violation of Title 18, United States Code, Section 1343.

COUNT 6

(Engaging in Monetary Transactions in Criminally Derived Property, 18 U.S.C. § 1957)

The United States Attorney further charges:

30. The factual allegations of Counts 1-5 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

31. On or about October 14, 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JEFFREY SKINNER did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, to wit, a $40,120 ACH transfer from Aviator, Inc.'s E-Trade account ending in 5967 for the purchase of 1,000 shares of AMC stock, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, to wit, Wire Fraud, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1957.

DAVID M. TOEPFER
United States Attorney

By: Elliot Morrison [signature]

Elliot Morrison
Chief, White Collar Crimes Unit